**In re: E.P., A Minor**

**Appeal of: C.P., Natural Mother**

**In re: J.P., A Minor**

**Appeal of: C.P., Natural Mother**

**In re: A.P., A Minor**

**Appeal of: C.P., Natural Mother**

Superior Court of Pennsylvania.

Submitted Sept. 22, 2003.

Filed Dec. 4, 2003.

Reargument Denied Feb. 13, 2004.

Sharon M. Biasca, Pittsburgh, for appellant.

J. Marie Webb, Pittsburgh, for appellees.

Wendy Kobee, Pittsburgh, for Allegheny County C.Y.S.

Before: HUDOCK, GRACI, JJ., and McEWEN, P.J.E.

GRACI, J.

¶ 1 Appellant, C.P. ("Mother") appeals the Order of the Allegheny County Court of Common Pleas, Juvenile Section, at Nos. 1230–02 through 1232–02, dated March 12, 2003, placing her three older and dependent children in foster care. After careful review, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

¶2 Mother is the single parent of four young children, J.P.(d.o.b. 6/6/94), A.P. (d.o.b. 11/4/96), E.P. (d.o.b. 9/4/98) and J.P. (d.o.b. 9/1/02). The family's involvement with Children Youth & Family Services ("CYF") began in December 2001, when CYF received reports that the oldest child had serious truancy problems, that the family's housing conditions were deplorable and that all three children were subject to neglect. CYF took immediate steps to intervene, arranging for the placement of crisis intervention services in the home to aid mother and ensure that the children were not at risk. CYF was unable to establish actual contact with Mother until June 2002. They found that mother was having difficulty caring for the children, her home and herself. Her situation was also exacerbated by the fact that she was pregnant. CYF filed a dependency petition on June 21, 2002, and cited Mother's "deplorable housing and neglect of all three children" including extensive school absences and tardiness. The petition also averred that "CYF placed crisis services in the home but [Mother] made minimal progress." The trial court heard the matter on November 13, 2002. The court heard testimony as to the condition of the home, the history of the children's school attendance problems, mother's mental health issues and her unavailability to CYF and service providers. Mother admitted that she was "overwhelmed" and not able to attend to both her children and all other issues on her own. She assured the trial court that she would cooperate with CYF and services and get the children to school and on time. Upon adjudicating the children dependent, the trial court permitted mother to retain custody of her children subject to certain conditions, including regular and prompt school attendance, and warned Mother that if the situation had not improved by the January 29, 2003, review hearing, the court might have to consider their removal. Additional in-home services were implemented to teach Mother basic life skills such as household management, bill-paying, budgeting and scheduling.

¶3 Permanency review hearings were held on January 29, 2003, and March 12, 2003. At the March review, information from the school revealed that the two oldest children were failing and the third child's attendance at Head Start was far below the acceptable standard. Although maternal grandmother insisted that she was getting the children off to school in time, they were documented as arriving late over fifty percent of the time and often hungry. Mother had also recently received an eviction notice. Upon the recommendation of CYF and the children's guardian *ad litem*, the court removed the three older children from their mother's custody and placed them in foster care. On the same date, the trial court held a shelter hearing on the youngest child, J.P., a six-month old infant, who was continued in his mother's custody.

¶4 Mother filed this timely appeal and raises this single issue for our review [1]:

---

1. On August 20, 2003, CYF filed a Petition for Leave to Supplement the Record and For Leave to File Amended Brief, requesting that transcripts of the November 13, 2002, and January 29, 2003, hearings be included in the record. This Court denied CYF's petition without prejudice to seek relief in the trial court. The trial court granted CYF's petition on October 8, 2003. Only the November 13, 2003, transcript, however, was added to the record and forwarded to this Court.

On September 2, 2003, Mother filed with this Court a Motion to Suppress Brief of Appellees E.P., J.P., and A.P., minors, which

Did the trial court abuse its discretion and err as a matter of law in finding sufficient evidence of a clear necessity to separate Mother and her dependent children, contrary to the requirements of 42 PA.C.S. § 6301(b)?

. . .

Appellants' Brief, at 4.

## II. DISCUSSION

■■■■ ¶ 5 Our standard and scope of review in dependency cases is well settled. [W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re R.W.J.*, 826 A.2d 10, 12 (Pa.Super.2003) (citations omitted).

¶ 6 The purposes of the Juvenile Act are set forth in Section 6301, which provides, in relevant part:

(b) Purposes.—This chapter shall be interpreted and construed as to effectuate the following purposes:

(1) To preserve the unity of the family whenever possible or to provide another alternative permanent fami-

---

Motion was deferred to this panel. As our decision is based upon only the certified record, including the November and March transcripts, we deny Mother's Motion to Suppress *as moot.* We note, however, that it was (and remains) Mother's obligation, as appellant, to insure that we have an adequate record to review her claim. *Conner v. DaimlerChrysler Corp.*, 820 A.2d 1266 (Pa.Super.2003). We have a broad scope of review in cases such as this. *See In re R.W.J.*, 826 A.2d 10, 12 (Pa.Super.2003). The scope of review refers to what the appellate court is permitted to examine. *Morrison v. Com., DPW*, 538 Pa. 122, 646 A.2d 565, 570 (1994). If a trial court gives specific reasons for its disposition, we may only examine its stated reasons. Where the trial court leaves open the possibility that reasons other than those specifically mentioned support its *decision we apply a "broad scope of review,* examining the entire record for any reason sufficient to justify" the trial court's conclusion. *Id.* Here, the trial court did not specify the reasons for its orders placing the children in foster care. A review of the transcript of the March 12, 2003, hearing demonstrates that the order was the culmination of all of the proceedings leading up to that hearing.

This conclusion finds support in the trial court's opinion where, quoting from the March 12 hearing transcript, the trial court explains: "Every time we come to court you understand that, but nothing seems to change. Meanwhile, the kids are slipping through the cracks." Opinion, 6/3/03, at 4 (citation omitted). It is clear then that the trial court did not limit its determination to that which occurred on March 12, 2003, and that we may, in the exercise of our broad scope of review, examine the entire record certified to us by the trial court. We will not (and have not) consider matters appended to a party's brief that are not contained in the certified record. Given our broad scope of review, all of the information to which the trial court had access in making its decisions should have been provided to this Court as part of Mother's appeal. Failure to take the steps necessary to see that the record was complete for our review could have resulted in our dismissing Mother's appeal. Pa.R.A.P.1911(d). As the record is sufficient for our review, though inexplicably incomplete, we will address the merits of Mother's claim and not invoke this drastic remedy.

ly when the unity of the family cannot be maintained.

(1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.

. . .

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health . . . .

42 Pa.C.S.A. § 6301(b)(1), (1.1), (3). Section 6302 sets forth the definition of a dependent child. Relevant to the current appeal, the statutory definition provides:

**"Dependent child."** A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals . . . .

. . .

(5) While subject to compulsory school attendance is habitually and without justification truant from school;[2]

42 Pa.C.S.A. § 6302(1), (5).

¶ 7 Section 6351 of the Juvenile Act establishes the guidelines for the disposition of dependent children, providing that:

(a) **General rule.**—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental and moral welfare of the child:

(1) Permit the child to remain with his parents . . . subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.[3]

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody . . . .

42 Pa.C.S.A. §§ 6351(a)(1), (2).

¶ 8 The Act also directs that prior to entering an order removing a dependent child from his parents, the court is directed to make findings:

(1) that continuation of the child in the home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition[.]

42 Pa.C.S.A. §§ 6351(b)(1), (2).

¶ 9 We agree with Mother that this Court has previously interpreted the Juvenile Act to allow for the removal of a dependent child from the custody of his parents only where there is "clear necessity" for such removal and where such removal can be reconciled with the "paramount purpose" of preserving family unity.

**2.** The trial court based its decision in finding J.P., a dependent child, in part, upon her truancy. 11/13/02 Hearing, at 20–21.

**3.** The trial court permitted J.P. to remain in Mother's custody provided that J.P. attend school every day and on time. The court further explained, "if she is still failing because she is missing reading and missing math or missing the entire day, then I am going to have to make a decision because I don't want to see her repeat—I don't want to see her fail the first grade again. And if avoiding that means removing her from your care, I will have to do that." 11/13/02 Hearing, at 25.

See e.g. *In Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271, 1273 (1976); *In Interest of Pernishek*, 268 Pa.Super. 447, 408 A.2d 872, 877 (1979); *In re Donna W.*, 284 Pa.Super. 338, 425 A.2d 1132, 1134 (1981). These cases, however, predate the 1998 amendments to the Juvenile Act which, as we explain below, altered the purposes of the Act. Moreover, this Court has also long held that such necessity for removal is implicated where the welfare of the child demands that he be taken from his parents' custody. *In re S.M.*, 418 Pa.Super. 359, 614 A.2d 312, 314–315 (1992). "When a child is ... being neglected to its detriment, it is the right and duty of the state, acting through its courts, to transfer the child's custody to persons who will treat the child in such a manner as to foster its well-being and promote its health and happiness." *In re Miller*, 380 Pa.Super. 423, 552 A.2d 261 (1988) (citations omitted). This view is reflected in the 1998 amendment to section 6301(b)(1) of the Juvenile Act which added an alternative paramount purpose of "provid[ing] another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301(b)(1). We agree with the Allegheny County Office of Children, Youth and Families ("OCYF") that by this amendment, part of the General Assembly's implementation of the Adoption and Safe Families Act of 1997 ("ASFA"), 42 U.S.C.A. § 629 (Public Law 105–89), "the focus of the [Juvenile] Act shifted somewhat from its emphasis on family unity to an emphasis on the child impacted by a dependency adjudication. The amendments, in compliance with the Federal legislation, emphasized permanency for children." Brief for Appellee OCYF, at 9.

¶ 10 Following the passage of ASFA, the Commonwealth's Office of Children, Youth & Families published a Bulletin emphasizing the need for permanency for children in the child welfare system. The Bulletin stated as follows:

> ASFA establishes unequivocally that the goals for children in the child welfare system are safety, permanency and well-being.... ASFA embodies several key principles that must be considered in implementing the law: ...
>
> • Substitute case is a temporary setting. It *is not a place for children to grow up.* For children who cannot safely return home, the law provides for an expedited process to find these children **permanent homes.**
>
> • **Permanency** planning for children begins as soon as the child enters substitute care. From the time a child enters placement, the agency must be diligent in finding a **permanent** family for the child.
>
> ...
>
> • Achieving **permanency** for children requires timely decisions from all elements of the child serving system.
>
> ...

*In Interest of Lilley*, 719 A.2d 327, 334 (Pa.Super.1998) (citing OCYF Bulletin, 3130–98–01).

¶ 11 Since the adoption of ASFA, this Court has sought to achieve the goal of permanency in termination of parental rights cases. *Id.*, 719 A.2d at 334–335 (mother's plea for continued foster placement of her child rejected and parental rights terminated freeing child for adoption for foster parents of fourteen years); *In re J.T. and R.T.*, 817 A.2d 505, 509 (Pa.Super.2003) (parental rights terminated after children placed in foster care for twelve months, court stated, "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.")

(citation omitted); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003) (parental rights terminated after child placed in foster care for over two years and court determined that wasn't in child's best interest to deny her permanent environment when it was found that mentally handicapped mother would never be capable to learning parenting skills).

¶ 12 We believe that this same need for permanency in a child's life is applicable in determinations regarding the removal of dependent children from parental custody as in the case *sub judice*. It is time that E.P., J.P. and A.P. are provided with an alternative permanent family.

¶ 13 Mother argues that the trial court's conclusion that Mother has made "little if any strides to properly care for her children" is not supported by the record. Appellant's Brief, at 11. She argues that she was "substantially compliant with the trial court's previous Orders and therefore making progress on the goals that the trial court had established in this case." *Id.* We agree that Mother partially complied with the trial court's previous orders by completing part of the required mental health evaluation, N.T., 3/13/03, at 5; by submitting to a random urine screen, the results of which were negative, Urine Screen Analysis, 11/13/02; by attempting to work with in-home service, N.T., 3/12/02, at 28; by enrolling E.P. and A.P. in school, *Id.*, at 4; and by making sure that her children had no unexcused absences since the date of the last hearing on January 29, 2003, *Id.* However, despite Mother's efforts, we find that the record supports the trial court's finding that the welfare of Mother's three oldest children demanded that they be taken from her custody.

¶ 14 Despite the assistance of three case workers and live-in help from her own mother, Mother is still unable to insure the timely attendance of her children at school. Ms. Brown, a representative of the school attended by J.P. and A.P., testified that between February 3, 2003, and March 5, 2003, the school recorded fourteen late arrivals and six absences. On the days that they were late, the children missed the scheduled time for breakfast provided by the school by a considerable margin. Ms. Brown also testified that because the children informed her that they were hungry when they arrived, that she provided them with breakfast, regardless of the time. "When they come in late, I do see they get breakfast. I don't care what time it is, I let them eat." *Id.*, at 10–11. This obviously resulted in even more time out of the classroom for the children.

¶ 15 Consequently, J.P. is unable to complete tests and class work, is not performing according to her academic potential, is eligible to fail first grade again, and will most likely be promoted for socialization rather than for academic purposes because she already repeated kindergarten. *Id.*, at 22. A.P., is performing below grade level in all areas, has recently appeared sad and depressed in class and may be required to repeat kindergarten. *Id.*, at 23. E.P.'s attendance at the Head Start program ranged from thirty percent in December 2002, to seventy-nine percent in January 2003, to sixty percent in February 2003. The program requires an eighty-five percent attendance rate. *Id.*, at 24. CYF testified that in light of the lack of structure in E.P.'s home environment, that attendance in a pre-school program such as Head Start is important if E.P. is to avoid future problems. *Id.*

¶ 16 Mother argues that while she does not minimize the importance of a strong educational foundation certainly, given our society's strong preference for preservation of the family, which is embodied in Pennsylvania's Juvenile Act.

More must be required of the burdened party to show that a clear necessity for removal exists.

The trial court's finding that the children "regularly arrive at school late and hungry" does not rise to the level of clear necessity for separation from Mother under the Juvenile Act and this Court's well settled case law.

Appellant's Brief, at 17, 18. Mother also notes in her brief, that compulsory school attendance in Pennsylvania does not begin until age eight, thereby implying that school attendance for her younger children is irrelevant. *Id.*, at 15 n. 10, and 17 n. 12.

¶ 17 We strongly disagree. When a parent's lack of organization and discipline causes their dependent children to be habitually tardy in their arrival at school so as to hinder their promotion to the next grade, the continuation of the children in the home is contrary to the welfare of the children and they should be taken from their parent's custody. 42 Pa.C.S.A. § 6351(b)(1); *In re S.M., supra; In re Miller, supra.* The fact that they arrived not only late, but also hungry, only emphasizes the inadequacy of Mother's care. The children were permitted to remain with Mother following the January 29, 2003, review hearing provided that they all attend school on time. They failed to do so despite the substantial efforts of CYF and the maternal grandmother. We find no abuse of discretion by the trial court in removing these previously adjudicated dependent children from Mother's custody.

¶ 18 Mother also argues that the clear necessity standard for separation of a child from his parent was not met because a feasible alternative to separation was available by placing increased responsibility for the care of the children upon Mother's parents. Appellant's Brief at 18. However, the record of the March 12, 2003 hearing indicates that despite substantial help from the children's grandmother, the children were still arriving late and hungry to school most days. We find no abuse of discretion by the trial court in dismissing Mother's suggestion that adding to the grandparents' childcare responsibilities was a feasible alternative to separation, when their present responsibilities appear beyond their capabilities. Such a conclusion fosters the purpose of the Juvenile Act of providing an alternative permanent family since, here, family unity cannot be maintained.

## III. CONCLUSION

¶ 19 While our legislature has directed us to interpret the Juvenile Act to effectuate the purpose of preserving family unity whenever possible, it has also directed us "to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301(a)(1). Regrettably, this is such a case. Despite a substantial amount of assistance from CYF and her own mother, Mother has demonstrated a continuing inability to insure that her children arrive at school without being hungry or on time. In the exercise of our independent judgment, we agree with the trial court's determination that "[t]he children's removal from Mother's care was both necessary and appropriate." Opinion, 6/3/03, at 5.

¶ 20 Order affirmed. Motion denied.

¶ 21 McEWEN, P.J.E., concurs in result.