J-A21030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 913 EDA 2021 |

Appeal from the Order Entered April 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-00001284-2020

BEFORE: KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED NOVEMBER 19, 2021**

N.O. (Mother) appeals from the order adjudicating L.A. (Child), born in March 2020, dependent, removing Child from Mother's care, and transferring custody to the Philadelphia Department of Human Services (DHS).[1]  Mother argues there was no clear and convincing evidence that Child lacked proper parental care.  We affirm based on the trial court's opinion.

The trial court summarized the factual and procedural history of this case in its opinion.  **See** Trial Ct. Op., 6/14/21, at 1-5.  The trial court adjudicated Child dependent on April 7, 2021, and it noted that the current

_____

[*] Former Justice specially assigned to the Superior Court.

[1] B.A. (Father) had also appealed from the order, but subsequently discontinued his appeal.  Praecipe for Discontinuance, 7/14/21.  We add that the trial court appointed James King, Esq., as Child's guardian *ad litem*.

placement goal is reunification with Mother. Order, 4/7/21. Mother filed a timely notice of appeal and Pa.R.A.P. 1925(b) statement on May 6, 2021.

Mother presents the following issues:

1. Did the trial court err as a matter of law and abuse its discretion by adjudicating [Child] to be a "dependent child" pursuant to 42 Pa.C.S. § 6302 in the absence of clear and convincing evidence that [Child] was "without proper parental care and control . . . as required by law?"

2. Did the trial court err as a matter of law and abuse its discretion by committing [Child] to the legal custody of [DHS] in the absence of clear and convincing evidence that removal from Mother was clearly necessary?

Mother's Brief at 3.

We summarize both of Mother's arguments together. Mother argues that the evidence "focused on events and conduct that took place" months or years earlier and DHS presented "little evidence" regarding her present ability to care for Child. *Id.* at 18. Mother acknowledges that DHS presented testimony that it could not recommend reunification because of domestic violence and Child's unexplained injury. *Id.* at 26. Mother, however, contends that she took steps to (1) address DHS's concerns regarding domestic violence, and (2) improve her parenting skills to "rectify any possible deficits . . . that may have contributed to" Child's injury. *Id.* at 27 (summarizing the steps). Mother also argues that testimony alleging that she did not display the parenting skills she had learned was unsupported by "any context, specificity, or example." *Id.* at 28. Mother reiterates that she separated from Father, established her own residence to facilitate Child's

return, and "was more than willing to engage with any services" provided by

DHS. *Id.* at 29.

Our standard of review follows:

In reviewing an order in a dependency matter, our standard of review requires us to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re Interest of N.B.*, ___ A.3d ___, ___, 2021 WL 3355495, *7 (Pa. Super.

2021) (citation omitted and formatting altered); *accord In re R.J.T.*, 9 A.3d

1179, 1190 (Pa. 2010) (reversing this Court in dependency case because

"[t]his case epitomizes why appellate courts must employ an abuse of

discretion standard of review, as we are not in a position to make the close

calls based on fact-specific determinations").

We are guided by the following:

To adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

Clear and convincing evidence has been defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

> In accordance with the overarching purpose of the Juvenile Act to preserve the unity of the family whenever possible, a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined proper parental care as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citations omitted and formatting altered); *accord* 42 Pa.C.S. § 6351(a).

"Following a finding of dependency, the trial court may make an order for the child's disposition pursuant to the Juvenile Act, which is best suited to the safety, protection and physical, mental, and moral welfare of the child." *In re A.C.*, 237 A.3d 553, 564 (Pa. Super. 2020) (formatting altered, citation and footnote omitted). One such disposition is removal of the child from her home:

> Under the provisions of the Juvenile Act, . . . the trial court is given broad discretion in meeting the goal of entering a disposition best suited to the protection and physical, mental, and moral welfare of the child. The trial court's decision to permit a child to either remain with his present caretaker(s), **or** to temporarily transfer custody to a qualified agency or individual, is subject only to the express limitation that the disposition be in the best interest of the child.

*A.C.*, 237 A.3d at 565 (emphasis in original, citations omitted, and formatting altered); *accord id.* (reiterating that the "child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved" (formatting altered and citation omitted)).

In determining whether to remove a child from parental care:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing [by the petitioner] that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.
>
> In addition, this Court has stated it is not for this Court, but for the trial court as fact finder, to determine whether a child's removal from her family was clearly necessary.

*In re A.B.*, 63 A.3d at 349-50 (citations omitted and formatting altered).

"A decision to remove a child from his or her parents' custody must be reconciled with the paramount purpose of preserving family unity." *In re A.L.*, 779 A.2d 1172, 1175 (Pa. Super. 2001) (citation omitted and formatting altered). Further, this Court has explained:

> We have previously recognized that reconciling the court's decision to remove a child from her parents' custody with the paramount purpose' of preserving the family unity may require that temporary custody of the child be given to someone other than the parents until such time as the welfare of the child no longer demands that he be separated from his parents. [*In re S.M.*, 614 A.2d at 312, 314-15 (Pa. Super. 1992) (citing *In re Frank W.D.*, 462 A.2d 708 (Pa. Super. 1983)] (decrees concerning children are temporary and subject to modification to meet changing conditions; appellant may institute proceedings to recover her child and present evidence or professional evaluations regarding any improvement in her parenting skills and abilities)).

*A.C.*, 237 A.3d at 566.

After careful review of the parties' arguments, the record, and the trial court's opinion, we affirm based on the trial court's opinion. *See* Trial Ct. Op. at 5-12. We add that Mother, who exercised her right to not testify, argued

that she took steps to address DHS's concerns. **See** Mother's Brief at 27. However, Guy Cine, the DHS case manager, testified that he could not recommend Child's reunification with Mother until she completed a parental capacity evaluation (PCE), which the trial court ordered. **See** Trial Ct. Op. at 8; N.T. Hr'g, 4/7/21, at 75, 100-01, 111. Accordingly, Mother's reunification with Child would be facilitated by her completion of a PCE. For these reasons, we agree with the trial court that it did not abuse its discretion and that Mother is due no relief. **See In re N.B.**, 2021 WL 3355495 at *7; **In re A.B.**, 63 A.3d at 349 (stating, "it is not for this Court, but for the trial court as fact finder, to determine whether a child's removal from her family was clearly necessary" (citation omitted and formatting altered)).

Finally, as the **A.C.** Court and the instant trial court recognized, it was in the best interest of Child that she be **temporarily** separated from Mother until such time conditions have improved. **See A.C.**, 237 A.3d at 556. As Mother points out, she has taken significant steps for reunification.

In recognition of Mother's positive actions to remedy difficult life challenges, upon remittance of the record, we direct the trial court to promptly schedule, at the parties' mutual convenience, a permanency hearing at which the trial court may evaluate Child's placement, which we acknowledge "turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved." **See id.** at 565. Further, to move the placement evaluation process forward, Mother is directed to complete the PCE

with DHS as previously ordered by the trial court as soon as it is practicable. Indeed, the trial court had properly scheduled a permanency hearing for August 6, 2021, which was likely continued in light of Mother's appeal. **See generally** 42 Pa.C.S. § 6351(e)(3) (stating that the trial court must conduct a permanency hearing within six months of the date of the child's removal from the parent).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2021

**IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION**

In the Interest of L.A., a Minor     :     CP-51-DP-0001284-2020

            :

            :

            :     FID:    51-FN-002641-2014

            :

APPEAL OF: N.O., Mother      :     913 EDA 2021

            :

**OPINION[1]**

**Fernandes, J.:**

Appellant N.O. ("Mother") appeals from the order entered on April 7, 2021, adjudicating L.A. ("Child") dependent, pursuant to the Juvenile Act, 42 Pa.C.S.A. §6302 "Dependent Child." Mother's counsel, Caroline Buck, Esquire, ("Mother's Counsel") filed a timely Notice of Appeal ("Notice") and Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) ("Statement") on May 6, 2021.

**Factual and Procedural Background:**

Child was born on March 16, 2020. Child became involved with the Philadelphia Department of Human Services ("DHS") on September 28, 2020, when the agency received a General Protective Services ("GPS") report alleging: that Child was six-months old; that Father had used inappropriate physical discipline in response to Child putting paper in her mouth; that Father had taken Child to his job site and Child returned home covered in paint; that there were concerns for Child's supervision. The report stated that Child was growing and developing well for her age and appeared at all medical well visits, that there were no signs of physical injury at any medical visits, and that Mother was appropriate with Child at medical visits. The report started that after one appointment, Mother and Father had a verbal altercation in a parking lot, Father left with Child, and refused to allow Mother into the car. Father was reportedly a first-time parent and disagreed

---

[1] The trial court requested the Notes of Testimony for April 7, 2021, on May 5, 2021. The trial sent a follow-up request for the April 7th Notes of Testimony on May 20, 2021. The Notes of Testimony for April 7, 2021, were received on May 24, 2021.

with the recommendations and guidance provided by Child's doctors. The report alleged that Father was asked to provide Child age-appropriate foods and refrain from putting food inside Child's bottles, but that Father ignored the instruction and believed Child had achieved more advanced developmental milestones than she was physically capable of achieving. The report also stated that medical staff continued to provide guidance on Child's expected milestones at each medical wellness visit, and that Father may have problems controlling his anger. The report was deemed valid.

On October 5, 2020, DHS spoke with Mother on the phone. Mother confirmed she was residing with Father. DHS requested Mother schedule a home visit. Mother was hesitant and expressed she did not want DHS to visit her home. A visit was scheduled for October 7, 2020.

On October 7, 2020, DHS visited the family's home. DHS provided the parents with the GPS notification and reviewed the allegations with them. DHS then explained the investigation process. Father appeared angered by DHS's presence in his home. DHS explained they were in the home to ensure Child's safety. Father stated he was a first-time parent and loved his daughter. Mother stated that she and Father took good care of Child. Mother reported a history with DHS but did not want to discuss further. DHS confirmed Mother had two older children removed from her care and subsequently adopted, with the case closed in 2019. DHS asked Father how he disciplined Child. Father denied striking Child on the mouth. Father reported that Child tried to pick things up all the time and he redirected her. Father explained that he was home most of the time due to the COVID-19 pandemic, and he kept the home clean to prevent Child from being exposed to anything unsafe. Father continued to explain that Child had begun crawling, but he typically did not allow her to be on the floor because he was afraid Child would injure herself. Father showed DHS Child's play yard in the living room and reported Child usually played there. DHS asked if Child had ever been to his workplace. Father stated Child had been a few times. DHS asked if Child had been exposed to anything unsafe at his workplace. Father denied, and stated while Child had been at his workplace, Father held Child while he walked throughout the property. DHS asked Mother if she had any concerns about Father's parenting. Mother denied any concerns. DHS talked with the parents about parenting classes. Mother reported attending parenting classes in the past but felt she did not need them. Mother reported she had previously attended therapy to deal with the adoption of her other two children and maintained contact with Women in Transition for support. Mother

denied use of physical discipline in the home. Child appeared well cared for and well-groomed. DHS confirmed Child had no marks or bruises at that time. Mother confirmed Child received pediatric care through Children's Hospital of Philadelphia ("CHOP") Karabots Clinic. Mother reported Child was last seen at CHOP on September 28, 2020. DHS received signatures for medical and CBH releases.

On October 13, 2020, DHS received a Child Protective Services ("CPS") report alleging that Child had been taken to CHOP due to concerns about the tenderness of her left wrist and an x-ray showed a buckle fracture of Child's left wrist. Both parents denied knowledge of recent trauma or falls. A skeletal survey indicated concern for other possible fractures. The report alleged Father stated Child had been napping in another room, he brought Child back to the room he was in, Child briefly crawled, and then began crying. Child was reportedly difficult to console. Parents attempted to give Child a bottle; Child refused. Mother tried to give Child a teething toy; Child refused this too. Father stated Child had her arm on top of his arm and when Father moved his arm, Child cried. Mother and Father stated they were Child's only caregivers. The report alleged that the parents denied any housing concerns, mental health history, legal involvement, or food insecurity. Mother was employed, but Father was unemployed due to the pandemic. Father admitted to one previous DHS investigation about a month earlier and stated that someone accused him of hitting Child. Father claimed the case was closed. Parents reported Child had a crib and a "pack n play," but stated Child slept in her parents' bed briefly with Mother for a nap. The report was indicated.

On October 14, 2020, DHS visited the family at CHOP. Child was observed in her hospital room with a swollen and red arm. Child appeared healthy otherwise. DHS observed Child being held by Father and appearing happy. Child had a buckle fracture of her left distal ulna (forearm). Child's head computed tomography ("CT") scan was normal. CHOP staff was unable to say whether Child's injury was accidental or the result of abuse. Mother continued to deny physical abuse in the home. Mother stated that Father could be controlling and overbearing at times. Father refused to listen to information about different forms of domestic violence. DHS observed Mother become very quiet in Father's presence. Father again denied the use of physical discipline with Child. Mother stated that she had left for work at 4 o'clock a.m. on October 13th and Child was left with Father. Father stated Child woke up around 6 o'clock a.m. and he then fed her a bottle and played with her. Father stated he then took Child on a car ride, and Child fell asleep in the car. Mother

reported she returned home from work at 1 o'clock p.m., greeted Child, and began cleaning the home. Father stated he retrieved Child from the bed where she slept with Mother and began playing with her, at which time he noticed Child was fussy and appeared in pain when her arm was moved. Mother denied Child had any redness or swelling prior to Mother going to work in the morning and stated Child had been fine, using both hands on October 12th. When interviewed alone, Father stated Child was fine when he left home. He reported that Mother and Child were alone for several hours and he noticed Child not using her left arm properly and crying when her arm was touched once Father returned home. It is not explained when Father left. Father stated he told Mother that they were taking Child to CHOP. Father reported that Child never fell, and he did not know what happened.

Parents were counseled about the dangers of co-sleeping. Mother admitted to taking a nap with Child before the injury was noticed. DHS explained to parents that a Safety Plan would be implemented, and Child needed to reside with a family member. Father identified two of Child's Paternal Aunts as resources. DHS determined both were appropriate caregivers and one was selected for Child's placement. DHS reviewed the purpose and reason for the Safety Plan with Parents. Mother signed the Safety Plan. DHS offered to assist Mother with getting into a domestic violence shelter, but Mother refused. Both DHS and Paternal Aunt expressed concern for Mother's safety, but Mother continued to refuse shelter services. Child began residing with Paternal Aunt on October 14, 2020.

On October 30, 2020, Father reportedly destroyed items in his home while in a rage due to Child not being returned to his custody. Mother was encouraged to file a police report but refused.

On November 1, 2020, Mother reportedly obtained a lease for a new home. It was unclear when she planned to move to the home. On November 9, 2020, Mother was reportedly residing with a family friend.

DHS filed a Dependency Petition on November 30, 2020. An adjudicatory trial was scheduled for January 29, 2021. Mother and Father attended the trial. The case was continued for further investigation.

On April 7, 2021, the court held an adjudicatory trial for Child. Mother was present for this trial. Testimony was provided by the DHS Social Worker, the DHS Investigator, and the Community Umbrella Agency ("CUA") Case Manager. After all testimony was given, the trial court found clear and convincing evidence to adjudicate Child dependent based on a finding of present inability. Child was committed to the custody of DHS and Child was ordered to remain as placed in Kinship Care with Paternal Aunt. Mother was given liberal visitation supervised by Paternal Aunt, with CUA to supervise twice per month. The court issued a stay away order for Father as to Mother and ordered Mother could obtain a Protection From Abuse ("PFA") order if necessary. Mother was ordered: to keep in contact with CUA; provide verification of employment monthly; continue participating in the CHOP Early Head Start program; continue attending mental health treatment; and provide a mental health treatment plan and progress report. Mother was referred to Behavioral Health Services ("BHS") for consultation and/or evaluation and monitoring. Mother was also to be referred for a parenting capacity evaluation ("PCE"). DHS Psychology Unit was authorized to speak to Mother's treatment team and share any DHS records, including PCE and mental health records. Child was committed to the custody of DHS, with a kinship referral to be made for Paternal Aunt. On May 6, 2021, Mother's Counsel filed this appeal on behalf of Mother.

**Discussion:**

On appeal, Mother[2] contends that the trial court erred as a matter of law and abused its discretion:

1. [B]y adjudicating L.A. to be a "dependent child" pursuant to 42 Pa.C.S. §6302 in the absence of clear and convincing evidence that L.A. was presently "without proper parental care and control...as required by law."

2. [B]y committing L.A. to the legal custody of the Philadelphia Department of Human Services in the absence of clear and convincing evidence that removal from Mother was clearly necessary.

A child will be adjudicated "dependent" if the trial court determines, by clear and convincing evidence, that Child is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for Child's physical, mental, or emotional health, or

---

[2] Father also filed a Notice of Appeal of the adjudication under EDA 881 of 2021. A separate opinion will be filed in Father's appeal.

morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian. Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In the Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)). An inquiry to determine whether a child is lacking the proper parental care and control encompasses two questions: "1) Is the child 'at this moment without proper care or control?; 2) If so, is such care and control 'immediately available?'" *In the Interest of Justin S.*, 543 A.2d 1192, 1198 (Pa. Super. 1988). The purpose of the Juvenile Act is to preserve the unity of the family whenever possible. 42 Pa.C.S.A. §6301(b)(1). Nonetheless, a child will be adjudicated dependent when the child is presently without proper parental care and the care is not immediately available. *In re R.T.*, 592 A.2d 55, 57 (Pa. Super. 1991) (citing *In re LaRue*, 366 A.2d 1271 (Pa. Super. 1976)). Superior Court has defined proper parental care as the care which is geared to the particularized needs of the child and, at minimum, is likely to prevent serious injury to the child. *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997) (citing *In the Interest of Justin S.*, *supra* at 1200) (see also *Matter of Yeager*, *infra*). The burden of proof in a dependency proceeding is on the petitioner. *In re C.R.S.*, *supra* at 842-843. The trial court is permitted to make a finding of dependency "on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary." *In the Interest of Black*, 417 A.2d 1178, 1182 (Pa. Super. 1980). Abuse is not essential for a finding of dependency, but rather the primary consideration is the ability and willingness of a parent to provide the necessary and proper care for a child's particular needs. *Matter of Yeager*, 455 A.2d 717, 719 (Pa. Super 1983).

It was established from testimony that DHS has a history with Mother, prior to this Child's case. In April 2015, DHS received a GPS report regarding domestic violence, inadequate food, and inappropriate discipline. (N.T. 04/07/21, pg. 12). Mother's parental rights to the two children in that case were terminated and the children were subsequently adopted. (N.T. 04/07/21, pg. 13).

DHS again became involved with this Mother when DHS received a GPS report alleging that Father had used inappropriate discipline and "popped" the present Child for putting paper in her mouth. (N.T. 04/07/21, pgs. 18-20). The GPS report was received on September 28, 2020, and

deemed valid. (N.T. 04/07/21, pgs. 18, 52). After receiving the report, DHS spoke with Mother via telephone, who expressed concern over Father's temper and fear of his possible reaction to the GPS report. (N.T. 04/07/21, pgs. 32-33). DHS came to the home and interviewed parents with respect to the GPS report. (N.T. 04/07/21, pg. 33). Father denied the allegations, while Mother did not say anything. (N.T. 04/07/21, pg. 33). DHS informed the parents about the dangers of co-sleeping at this time. (N.T. 04/07/21, pgs. 33-34). Mother stated she was unaware that Child needed her own sleeping space and should not sleep in the same bed as her parents. (N.T. 04/07/21, pg. 33). Mother reported a history with DHS and previous domestic violence services. (N.T. 04/07/21, pgs. 33-34). Mother indicated she was not in therapy services at that time. (N.T. 04/07/21, pg. 34).

DHS then received a CPS report on October 13, 2020 alleging the parents had caused bodily injury to Child through a recent act or failure to act when then-six-month old Child presented at CHOP ER with a buckle fracture of the wrist. (N.T. 04/07/21, pg. 21-23). The CPS report was indicated. (N.T. 04/07/21, pg. 52). DHS observed Child in the hospital, in a hospital gown with a brace on her left forearm. (N.T. 04/07/21, pgs. 26, 34). DHS interviewed both parents again at this point. Mother reported she worked late while Father remained at home with Child. (N.T. 04/07/21, pg. 35). After Mother returned home, Mother stated she laid down and took a nap with Child for about two hours, after being counseled against this behavior, and Father left the home. (N.T. 04/07/21, pg. 35). Mother did not notice any injury to Child after the nap. (N.T. 04/07/21, pg. 35). Mother reported that Father had noticed Child was "acting kind of funny" and suggested they take Child to the emergency room. (N.T. 04/07/21, pgs. 35, 64). No one was able to provide an explanation as to how Child sustained a buckle fracture and Father specifically denied causing the injury. (N.T. 04/07/21, pgs. 44, 48, 53, 66). Mother and Father were Child's only caregivers. (N.T. 04/07/21, pgs. 52-53, 66). Mother signed releases for Child's CHOP pediatrician. (N.T. 04/07/21, pg. 36). DHS went through Child's medical history with the hospital social worker and called the pediatrician. (N.T. 04/07/21, pg. 36). DHS learned of an incident where Mother and Father had an altercation at the pediatrician's office, where Father came into the office and took Child from Mother's arms. (N.T. 04/07/21, pgs. 37-38).

Child was discharged from CHOP on October 15, 2020, at which time DHS implemented a Safety Plan. (N.T. 04/07/21, pg. 42). Child was sent to live with a Paternal Aunt. (N.T. 04/07/21, pg. 42). Child was moved to the home of a second Paternal Aunt in February 2021 after a verbal altercation

occurred at a visit. (N.T. 04/07/21, pg. 71). DHS observed Mother appearing fearful upon arrival at the home after Child's hospital discharge and home removal. (N.T. 04/07/21, pg. 42). On October 28, 2020, DHS received multiple phone calls and text messages from Father, alleging that Child was supposed to be returned to him and Mother by that time. (N.T. 04/07/21, pgs. 44, 79-80). Mother also sent text messages to DHS alerting DHS to destruction Father was engaging in. Mother sent DHS photographs depicting damage Father had done while "destroying their apartment." (N.T. 04/07/21, pg. 44, 61-63). DHS instructed Mother to file a police report, but Mother refused. (N.T. 04/07/21, pgs. 44-45, 61). DHS testified that they recommend Mother undergo a PCE as she had reported instances of domestic violence between her and Father, but refused to actively acknowledge she was in another domestic violence situation. (N.T. 04/07/21, pg. 46).

Mother currently lives alone, without Father. (N.T. 04/07/21, pg. 68). DHS and CUA did a virtual home assessment and found the home appropriate, with appropriate sleeping arrangements for Child. (N.T. 04/07/21, pg. 68). DHS had recommended that Mother undergo a new PCE and psychiatric evaluation, and reenter domestic violence services. (N.T. 04/07/21, pgs. 46, 68). CUA testified that Mother had enrolled in parenting courses, mental health services, and domestic violence services. (N.T. 04/07/21, pgs. 74, 94-95). Mother assisted in scheduling Child's medical appointments. (N.T. 04/07/21, pg. 96). CUA could not safely recommend reunification with Mother, until a PCE was completed. (N.T. 04/07/21, pg. 75). CUA had concern that Mother was not displaying the skills she was learning through ARC services. (N.T. 04/07/21, pg. 75).

DHs observed Mother with Child at the hospital. (N.T. 04/07/21, pg. 69). Mother was attentive to Child's needs, and ensured Child had everything she needed. (N.T. 04/07/21, pg. 69). Child was observed holding onto Mother. (N.T. 04/07/21, pg. 69). Child appeared safe with Mother at the hospital. (N.T. 04/07/21, pg. 69). Child abuse is not required for a finding of dependency. However, Mother must exhibit "proper parental care" that is geared toward the particularized needs of the Child and, at minimum, is likely to prevent serious injury to the Child. *In the Matter of C.R.S., supra.* The record established that Child suffered an unexplained injury while in the care of both parents. Child had no caregivers other than Mother and Father. (N.T. 04/07/21, pgs. 47, 53, 66). Neither parent was able to provide an explanation as to how Child was injured. (N.T. 04/07/21, pg. 53). Child was six-months old at the time of the buckle fracture. (N.T. 04/07/21, pg.

23). Mother had been counseled about the dangers of co-sleeping and Child's needs prior to Child's admission to CHOP. (N.T. 04/07/21, pgs. 33-34). Mother did not provide an explanation for Child's injury and provided no information about other possible traumas that could have explained the injury. (N.T. 04/07/21, pgs. 47, 53). Mother did not testify at the trial; therefore, the trial court only heard the testimony of the DHS witnesses. (N.T. 04/07/21, pg. 98). No witness was able to provide testimony explaining how Child's injury occurred. After considering the testimony, the court found that Mother and Father were the sole caregivers for Child and the injury was unexplained. (N.T. 04/07/21, pg. 108). After taking into consideration the whole record that Mother had her parental rights to two other children previously terminated, prognostic evidence that the trial court may consider, DHS investigation results which validated or indicated child welfare reports putting the Child's safety at risk, and the Child, a one-year old, suffering an unexplained injury, the trial court found clear and convincing evidence to adjudicate Child dependent. The Child lacks proper parental care and control, and Child's welfare was at risk. It is clear and convincing that Mother is also not able to provide proper parental care to the Child immediately. DHS met its burden and the DHS witnesses were credible. Mother does not have the present ability to care for Child. Accordingly, the trial court did not abuse its discretion in determining the Child was a dependent child.

A dependency trial is a two-stage process. The first stage requires the trial court to hear evidence and to determine, by clear and convincing evidence, that the child is without proper parental care, control, or subsistence necessary for the child's physical, mental, moral, or emotional health. *In re A.B.*, 63 A.3d 354, 349 (Pa. Super. 2013). If the trial court finds the child dependent, the court may move to the second stage, in which it must make an appropriate disposition consistent with the best interest of the child. *In re L.C., II.*, 900 A.2d 378, 381 (Pa. Super. 2006); *see also*, *In re A.E.*, 722 A.2d 213, 215 (Pa. Super. 1998). Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined by the child's best interest. *In re Sweeney*, 574 A.2d 690, 691 (Pa. Super. 1990). A child cannot be removed from their parent unless upon a showing that the separation is clearly necessary. *In re G.T.*, 845 A.2d 870, 873 (Pa. Super 2004). Clear necessity is found when "'the welfare of the child demands that [they] be taken from [their] parents' custody.'" *In re G.T.*, *id*. (quoting *In re S.M.*, 614 A.2d 312, 314 (1992). Once there has been a showing of clear necessity, the trial court may remove a child from the care of the child's parents. *In re E.P.*, 841 A.2d 128, 132 (Pa. Super. 2003). Before the trial court can enter any order

of disposition that would remove a dependent child from their home, the court must determine that prior to placement, reasonable efforts were made to prevent or eliminate the need for removal of the child from the home. 42 Pa.C.S.A. §6351(b)(2).

After the trial court adjudicates the Child dependent, it must determine whether it is clearly necessary to remove the Child from Mother. However, before it may remove the Child from Mother, the trial court must find that continuation of the Child in the home would be contrary to the welfare, safety, or health of the Child, and that reasonable efforts were made prior to placement to prevent or eliminate the need for removal. Necessity is established when the trial court has considered alternative dispositions which allow the Child to remain with Mother and determined that those alternatives to placement are unfeasible. Mother had a history with DHS prior to this Child's birth and had her parental rights to two other children involuntarily terminated. (N.T. 04/07/21, pgs. 12-13). Mother admitted to the DHS investigator that she had previous domestic violence services and mental health services, but she was not engaged in therapy at this time. (N.T. 04/07/21, pgs. 33-34). DHS received a GPS report alleging Father had used inappropriate discipline with the current Child on September 28, 2020. (N.T. 04/07/21, pg. 18-20). On October 13, 2020, DHS received a CPS report alleging that Child had been admitted to CHOP with an unexplained buckle fracture. (N.T. 04/07/21, pgs. 21-23). DHS went to the home to investigate after the GPS report two weeks prior to the CPS report; at that time, DHS counseled Mother about the dangers of co-sleeping. (N.T. 04/07/21, pg. 33). Mother stated she was unaware that Child needed her own sleeping space, but agreed to provide one. (N.T. 04/07/21, pgs. 33). Mother reported that Father had a temper and expressed fear about DHS coming to the home to investigate the GPS report, because Mother believed Father would think she had reported him. (N.T. 04/07/21, pgs. 32-33). Child's buckle fracture remained unexplained by the time of the adjudication trial on April 2021. (N.T. 04/07/21, pgs. 47, 53, 66, 108). After Child was discharged from CHOP and sent to live with a Paternal Aunt on a Safety Plan, DHS offered to assist Mother in getting into a domestic violence shelter and offered to implement other services for the family. (N.T. 04/07/21, pg. 42). Mother declined services at that time. (N.T. 04/07/21, pg. 42). Mother reached out to DHS on October 28, 2020, reporting property destruction by Father. Mother was instructed to contact the police, but she did not do so. (N.T. 04/07/21, pg. 44). In December 2020, DHS and CUA helped Mother relocate away from Father and into a friend's home in Delaware, but Mother returned to Philadelphia the next night. (N.T. 04/07/21, pgs. 42-43). The DHS investigator learned of an

incident between Mother and Father where both parents got involved in an altercation at the Child's pediatrician's office. (N.T. 04/07/21, pgs. 37-38). After a Safety Plan was implemented, the DHS investigator learned of another verbal altercation occurring at a visit, necessitating the Child to be moved to another Paternal Aunt for safety reasons. (N.T. 04/07/21, pg. 71).

At the time of the trial, Mother had enrolled in a parenting course, mental health services, and domestic violence services. (N.T. 04/07/21, pgs. 74, 94-95). However, despite Mother having engaged in services, the CUA Case Manager had concern that Mother was not displaying the skills she was learning through attendance at these programs. (N.T. 04/07/21, pg. 75). The record established that DHS attempted on multiple occasions to provide services to Mother to prevent Child's removal. (N.T. 04/07/21, pg. 42). Upon consideration of the DHS witnesses testimony, the trial court concluded that Mother does not have the present ability to care for the Child, and it would be against the health, safety, and well-being of Child to remain in the home. Consequently, the trial court determined that there was a clear necessity for the Child to be removed from Mother and remain with Paternal Aunt. Mother did not testify. (N.T. 04/07/21, pg. 98). Mother was ordered to complete her objectives in order to place herself in a position to regain custody of her Child. The trial court issued a stay-away order for Father as to Mother. (N.T. 04/07/21, pg. 109). Mother was provided liberal supervised visitation, with the CUA Case Manager to supervise on alternate weeks, separate from Father. (N.T. 04/07/21, pgs. 110, 118). Mother was ordered to maintain contact with CUA and provide monthly verification of her employment. BHS was ordered to monitor Mother's mental health treatment. Mother was also ordered to undergo a PCE and comply with its recommendations. Mother was permitted to continue attending the CHOP Head Start program and access Child's medical charts if she was unable to attend medical visits due to pandemic restrictions. (N.T. 04/07/21, pgs. 110-111, 116). The trial court did not abuse its discretion when it removed Child from Mother and allowed her to remain in kinship care with the second Paternal Aunt. The record supports the trial court's findings and conclusion that Child is dependent, and that placement of Child with DHS is necessary and appropriate for Child's well-being and safety.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear

and convincing evidence regarding Child's dependency adjudication pursuant to paragraph (1) of the definition of "Dependent Child" under 42 Pa.C.S.A. §6302, and Mother is not ready, able, and willing to care for the Child at this time. Accordingly, the order entered by the trial court on April 7, 2021, adjudicating Child dependent should be affirmed.

By the court,

_____

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of L.A., a Minor | : | CP-51-DP-0001284-2020 |
| | : | |
| | : | |
| | : | FID: 51-FN-002641-2014 |
| | : | |
| APPEAL OF: N.O., Mother | : | 913 EDA 2021 |

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all parties or their counsel on June 14, 2021. The names and addresses of all persons served are as follows:

A. Bennette Harrison, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
a.bennette.harrison@phila.gov

James King, Esq.
1001 N Elbow Lane
Yardley, Pennsylvania 19067
Jk4717@comcast.net

Caroline Buck, Esq.
1424 Chestnut Street
Philadelphia, Pennsylvania 19102
cbuck@clsphila.org

Janice Sulman, Esq.
1500 Walnut Street, Suite 2000
Philadelphia, Pennsylvania 19102
jansulman@hotmail.com

BY: _____
Sabine A. Glocker, Esq.
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
Family Division
1501 Arch St., Room 1431
Philadelphia, Pa. 19102
T: (215) 686-2660 | F: (215) 686-4224
sabine.glocker@courts.phila.gov

Page 1 of 1