J-A16002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M., MOTHER | : : : : : : : | |
| | : | No. 149 EDA 2022 |

Appeal from the Order Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000072-2021

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:          **FILED AUGUST 12, 2022**

J.M. ("Mother") appeals from the order adjudicating N.M. ("Child"), born November 2020, dependent. Mother argues the trial court erred when it found Child dependent and placed her in kinship care, erred in its evidentiary rulings, and violated her Due Process rights. We affirm.

The trial court set forth the factual and procedural history, which we adopt and incorporate herein. Trial Court Opinion, filed Jan. 26, 2022, at 1-10 ("Trial Ct. Op."). We will provide a summary.

In 2017, prior to Child's birth, Child's five older siblings came into DHS's care due to concerns regarding domestic violence, substance abuse, mental health, and housing. *Id.* at 2. In September 2019, DHS received a GPS report that Mother tested positive for methadone when she gave birth to another of

_____

[*] Retired Senior Judge assigned to the Superior Court.

Child's siblings. *Id.* Approximately 14 months later, in November 2020, Child was born. Mother tested negative for substances at the time of Child's birth, but DHS received a report that she had tested positive for cocaine, PCP, and fentanyl during her pregnancy. N.T., 8/17/2021, at 13-14. DHS received a GPS report in January 2021, that Child had been admitted to St. Christopher's Hospital. *Id.* at 12-13. Child was transferred to CHOP. Mother was escorted from CHOP after she threatened to remove Child against medical advice. *Id.*; N.T., 8/17/2021, at 25. DHS obtained an order for protective custody in January 2021, and, after a shelter care hearing, the court found Child medically needed and ordered the temporary commitment to stand. Trial Ct. Op. at 2-3.

The trial court held a multi-day adjudicatory hearing. At the first day of the hearing, in June 2021, it heard from the Community Umbrella Agency's ("CUA") case manager/supervisor Joshua Hage. He testified there were concerns regarding Mother's drug and alcohol history, mental health, domestic violence, anger management, and housing. N.T., 6/16/2021, at 83. Although Mother had drug screens through Gaudenzia, he was unable to confirm whether they were random. *Id.* at 85-86. Hage testified Mother's visits were moved from supervised at the CUA to supervised at DHS due to Mother's erratic behavior and threats she made. *Id.* at 91-92.

The court resumed the proceedings in August 2021. DHS investigative worker Erica Payne testified that Mother signed consent forms for Gaudenzia and Best Behavioral Health but refused to sign releases for her prenatal care.

N.T., 8/17/2021, at 14-15, 18. She further testified that Mother did not keep the appointment for a home assessment. *Id.* at 20-21. Payne had concerns regarding Mother's mental health, impulse control, defensiveness, minimal compliance with the investigation, and drug and alcohol history. *Id.* at 27-28. Payne testified that Mother was in treatment and provided screens, but DHS was unable to determine whether the screens were random. *Id.* at 28.

Hage resumed his testimony, stating he had concerns regarding Mother's mental health because of her failure to consistently attend treatment at Best Behavioral Health and her mental health diagnoses, including post traumatic stress disorder, anxiety, depression, and cocaine and opioid dependency. *Id.* at 88, 99-100. Hage testified he did not think a mother-baby program was appropriate due to concerns about Mother's protective capacity. *Id.* at 113-14. Hage further testified that Mother did not have suitable housing. *Id.* at 101. She resided with maternal grandmother, who did not want her home to be considered a reunification resource. *Id.* Mother's visits were supervised at DHS, due to her outbursts and the agency's concerns for safety. *Id.* at 104.

In November 2021, the court held the final day of the adjudicatory hearing. CUA case manager Ericka Mitchell testified. She had been assigned the case in September 2021 and had concerns regarding Mother's mental health, including her aggressive and erratic behavior. N.T., 11/19/2021, at 18-19. She testified Mother showed aggressive behavior throughout the case, including threatening a case aide and the foster parents of Child's sibling. *Id.*

at 19, 23. She further testified Mother refused to sign mental health releases. *Id.* at 25. She stated Mother obtained random drug screens from Gaudenzia and the most recent was negative. *Id.* at 32. Further, Mother completed a parenting course and Mitchell did not have concerns regarding Mother's parenting. *Id.* at 33-34. Mitchell further testified Mother attended five out of seven individual therapy sessions since August 2021. *Id.* at 92. Mother was approved for housing in Westmoreland County, but the housing was conditioned on her being reunited with all seven children. *Id.* at 47-48. That was no longer viable due to a pending termination petition for two of the children. *Id.* at 95-96.

Mother's OB/GYN, Dr. Michelle Duncan, testified on Mother's behalf. She testified that Mother tested negative for controlled substances at Child's birth and did not test positive for any substances while the doctor was treating Mother in 2020. N.T., 8/17/2021, at 62-63, 84. The Director of the Gaudenzia WINNER program also testified. The WINNER program is a mother-baby program that had accepted Mother. *Id.* at 152-69.

Mother testified that she had been clean for two years and that she was compliant with her mental health treatment, which she found helpful. N.T., 11/19/2021, at 113, 117-18.

Child's foster parent testified that she did not think Mother continued to have substance abuse issues and, although Mother had mental health issues, she did not believe they would impact her ability to care for Child. *Id.* at 172-79.

- 4 -

The trial court adjudicated Child dependent in December 2021. Mother filed a timely notice of appeal.

Mother raises the following issues:

1. Was Mother, J.M., denied Due Process, in that the evidence presented by DHS was largely inadmissible hearsay?

2. Did DHS fail to prove grounds for dependency by "clear and convincing" evidence?

3. Did the trial court err in ordering that the child remain in state custody?

4. Did the court err by denying Due Process of Law to J.M., Mother, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America?

Mother's Br. at 4.

We will address Mother's first and fourth issues together. In her first issue, Mother argues that DHS's evidence was mostly inadmissible hearsay, which impacted Mother's ability to cross-examine adverse witnesses. In her fourth issue, Mother argues she was denied due process because the decision was based on inadmissible hearsay, and not on competent evidence. She claims that "[b]y committing errors of law in conducting the proceedings which led to termination of the parental rights of Mother," the trial court "necessarily violated her fundamental rights." Mother's Br. at 19.

Mother waived these issues because she did not raise them with sufficient detail in her statement of errors complained of on appeal pursuant to Pennsylvania Rules of Appellate Procedure 1925(b). Rule 1925(b) requires

the appellant to "concisely identify" in the statement "each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). Any issues not included in the 1925(b) statement, or not raised in accordance with the Rule, are waived. Pa.R.A.P. 1925(b)(4)(vii).

In her 1925(b) statement, Mother raised the following issues:

> 1. Ruling that [Child] be adjudicated dependent without holding an adjudicatory hearing.
>
> 2. Ruling that [Child] be committed to DHS, without holding a dispositional hearing.
>
> 3. Ruling as stated above, without making findings, determinations, and orders required by the Juvenile Act and by court rules, including but not limited to, Pa.R.J.C.P. 1401.
>
> 4. Failing to rule upon [Mother's] Motion for Reconsideration, thus forcing [Mother] to choose between 1) losing her rights to obtain relief, and 2) filing this Appeal, and divesting the Trial Court of jurisdiction to take further action.
>
> 5. Denying Due Process of Law to [Mother], as guaranteed by the Constitution of the Commonwealth of Pennsylvania and of the United States of America.
>
> 6. [Mother] reserved the right to expand and to supplement this Concise Statement, and to raise any additional issues in her Appellant's Brief, for the following reasons:
>
> > a. Pursuant to Children's Fast Track Rules, this Concise Statement is being filed at the same time as is the Notice of Appeal and Order for Transcript,
> >
> > b. Therefore, this Concise Statement must be prepared and filed without benefit of a copy of the Transcript.

- 6 -

Concise Statement of Matters Complained of on Appeal, filed Jan. 5, 2022. Mother did not seek to amend her 1925(b) statement after receipt of the transcript.

Here, Mother's Rule 1925(b) statement did not elaborate on the substance of her due process claim. As a result, the trial court did know the nature of the alleged due process violation. *See* Trial Ct. Op. at 18-19 (noting Mother's "broad assertion does not state the basis of the denial of Mother's due process rights," and that it "could not speculate what" was intended, and noting that Mother was provided an opportunity to participate at each listing and to present her evidence and testimony). The statement did not apprise the judge of the issue it should discuss.

Although Mother attempted to "reserve" a right to raise new claims on appeal because she filed the Rule 1925(b) statement without the benefit of a transcript, this is not permissible. Nothing in the rule or in caselaw affords an appellant an absolute right to amend a Rule 1925(b) statement without the court's permission. There was thus no right to "reserve." Counsel could have sought the trial court's leave to amend the Rule 1925(b) statement, but did not. *See* Pa.R.A.P. 1925(b)(2)(i) (permitting court, on application and for good cause, to "permit an amended to supplemental Statement to be filed"). Furthermore, it appears the due process claim is based at least in part on alleged evidentiary errors. As counsel was present at the hearing and appears to have based a separate claim on the evidentiary issues, such errors were

known at the time of the filing of the Rule 1925(b) statement, without aid of the transcript.

In her second issue, Mother claims DHS did not prove dependency by clear and convincing evidence. She argues the evidence was mostly inadmissible hearsay and, even if the hearsay is considered, it did not prove dependency. The evidence concerned events that occurred two to three years in the past and the events were not relevant to her current ability. She argues that an adjudication of dependency must be based on her current conduct and condition.

We review orders entered in dependency cases for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We must accept the findings of fact and credibility determinations if they are supported by the record, but we are not required to accept the trial court's inferences or conclusions of law. *Id.*

A "dependent child" includes a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302 (**"Dependent child"**). "A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent . . . that places the health, safety or welfare of the child at risk," including evidence of the parent's "use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk." *Id.* The petitioner must demonstrate by clear and convincing evidence that a child meets the

statutory definition of a dependent child. ***In re G.T.***, 845 A.2d 870, 782 (Pa.Super. 2004).

The trial court concluded the testimony at the hearing supported the adjudication, reasoning it had heard testimony that Child's health and safety were at risk because of Mother's present inability to provide adequate care for Child. It commended Mother for making progress to alleviate the dependency issues but stated it continued to have concerns with Mother's ability to provide adequate care for Child. It noted the unavailability of provably random drug screens, and issues with Mother's housing, anger management, and mental health. ***See*** 1925(a) Op. at 15. The court added that Mother's visits are supervised with increased security due to Mother's threatening behavior. After review of the briefs, trial court record, relevant law, and the well-reasoned opinion of the Honorable Cateria R. McCabe, we affirm on the basis of the trial court opinion. 1925(a) Op. at 12-16.

In her third issue, Mother asserts the court erred in ordering that Child remain in DHS's custody. She claims the court provided no analysis or mention as to whether DHS made reasonable efforts, and no evidence of the same.

Where a child is adjudicated dependent, a court "may not separate that child from his or her parent unless if finds that the separation is clearly necessary." ***In re G.T.***, 845 A.2d at 873. "Such necessity is implicated where the welfare of the child demands that he . . . be taken from his parents' custody." ***Id.*** (quoting ***In Int. of J.M.***, 652 A.2d 877, 881 (Pa.Super. 1995)).

The trial court concluded it heard credible testimony that outstanding dependency issues existed that would affect Mother's ability to provide adequate care for Child. It acknowledged Mother had made progress but found Mother's mental health was not stable enough to reunify with Child. It further pointed out it had heard credible testimony that Mother had threatened to physically harm the foster parent of Child's sibling. It noted Mother had not signed mental health releases until November 2021, so it was unaware if Mother's current health treatment provider was addressing all of Mother's mental health issues and that the CUA was unable to assess Mother's housing. The court concluded reunification would create a health and safety risk for Child and Child's best interest would be met in kinship care.

We conclude the trial court did not abuse its discretion. After review of the briefs, the trial court record, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. **See** 1925(a) Op. at 17-18.[1]

Order affirmed.

---

[1] Mother argues that the trial court failed to make any findings regarding reasonable efforts under 42 Pa.C.S.A. § 6351(b)(2). Section 6351(b)(2) provides that prior to entering an order finding a child dependent the court shall make findings as to "whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition." Here, Child had not remained in the home pending the disposition.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/12/2022</u>

**IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION - DEPENDENCY BRANCH**

**IN RE:**

**N.M. a minor, D/O/B: 11/12/2020**       :       **CP-51-DP-0000072-2021**
                                          :       **51-FN-000600-2016**
                                          :
                                          :
                                          :       **Superior Court No. 149 EDA 2022**
**APPEAL OF: J.M., Mother**               :       **Superior Court No. 150 EDA 2022**


## <u>OPINION</u>


### I.       <u>INTRODUCTION</u>

J.M., ("Mother"), appeals from the Order for Adjudication entered by this Court on December 7, 2021, pertaining to her child N.M.[1] Testimony for the Adjudicatory Hearing expands across three (3) hearing dates: June 16, 2021, August 17, 2021, and November 19, 2021, attached hereto as Court's Exhibit A, B, and C, respectively. Also essential to the trial court's determinations were DHS Exhibits 1-14 entered during the 6/16/2021, 8/17/2021, and 11/19/2021 hearings, attached hereto as Court's Exhibit D, and Mother's Exhibits 1-19 from the 8/17/2021 and 11/19/2021 hearings, attached hereto as Court's Exhibit E. At the close of the evidentiary hearings, the trial court left the record open for two weeks to allow Counsel for DHS and Mother's counsel to submit amended exhibits. On December 7, 2021, once the record was closed, this Court issued an Order adjudicating N.M. dependent based on Mother's present inability and committed N.M. to the Philadelphia Department of Human Services ("DHS").

---

[1] N.M.'s has six siblings in DHS care whose cases are at the Goal Change/TPR or Permanency Review stages in the dependency proceedings. Any further references to N.M.'s siblings are to explain testimonial and evidentiary information considered by the trial court.

1

## II.     FACTUAL and PROCEDURAL HISTORY

The relevant facts and procedural history of this case are as follows. DHS first became aware of this family on July 27, 2017, prior to N.M.'s birth. DHS received a General Protective Services ("GPS report") on July 27, 2017 alleging that Mother and N.M.'s siblings had been attacked by three woman, one of which was the paramour of N.M.'s siblings' Father, Mr. Bush. The GPS report was determined to be valid. There were also concerns regarding domestic violence as well as Mother's substance abuse, mental health, and housing. On October 14, 2017, DHS obtained an Order for Protective Custody ("OPC") for N.M.'s five siblings and placed them in foster care. On September 5, 2019, DHS received a GPS report that Mother tested positive for methadone when she gave birth to N.M.'s sixth sibling. N.M.'s six siblings all remain committed to DHS. On March 13, 2020, Mother had a psychological evaluation conducted by Ms. Bernadette Hayburn, in which she was diagnosed with post-traumatic stress disorder (PTSD), generalized anxiety disorder, and major recurrent sever depressive disorder. (See DHS-10).

On November 12, 2020, N.M. was born at Temple University Hospital (TUH). N.M. and Mother tested negative for substances when N.M. was born. However, Mother tested positive for cocaine, phencyclidine (PCP), and fentanyl during her pregnancy with N.M. On December 10, 2020, N.M. was transferred to St. Christopher's Hospital for further treatment. On January 14, 2021, DHS received a GPS report alleging that two-month old N.M. was admitted to St. Christopher's Hospital. The transfer records indicated that Mother had a history of cocaine use, and that all of N.M.'s siblings were in DHS placement. The report was determined to be valid. On January 20, 2021, N.M. was discharged from St. Christopher's Hospital and transferred to the Children's Hospital of Philadelphia (CHOP). The discharge summary indicated that N.M. was

born prematurely and had respiratory issues. On January 24, 2021, Mother was escorted from CHOP by security after she threatened to remove N.M. against medical advice.

On January 25, 2021, DHS obtained an OPC for N.M. At the January 27, 2021 shelter care hearing, this Court found that N.M. was medically needed. The OPC was lifted and this Court ordered the temporary commit to DHS to stand. Upon discharge from CHOP on February 3, 2021, N.M. was placed in a medical foster care home. (N.T. 8/17/2021, p. 30 at 7-15 (Exhibit B)). On May 10, 2021, N.M. was placed in a kinship home, where she remains. (N.T. 6/16/2021, p. 38 at 16-29 (Exhibit A)); (N.T. 8/17/2021, p. 30 at 21-23 (Exhibit B)).

The Adjudicatory Hearing for N.M. began on June 16, 2021 when N.M.'s case was not yet bifurcated from her siblings' cases.[2] N.M.'s case was continued due to time constraints, and this Court incorporated the testimony from that hearing as to Mother into N.M.'s case. (N.T. 6/16/2021, p. 21 at 6-19 (Exhibit A)). During the hearing, DHS entered DHS Exhibits 1-6: dependency dockets for N.M.'s six siblings. (N.T. 6/16/2021, p. 67 at 22-25 (Exhibit A)). Community Umbrella Agency ("CUA") Case Manager/Supervisor, Mr. Joshua Hage, testified that CUA's dependency concerns were Mother's drug and alcohol history, mental health concerns, domestic violence, anger management, as well as housing concerns. (N.T. 6/16/2021, p. 83-87 (Exhibit A)). Mr. Hage testified that while Mother took drug screens through her outpatient program at Gaudenzia, he was unable to confirm whether the screens were random. (N.T. 6/16/2021, p. 85 at 18-25; p. 86 at 1-10 (Exhibit A)). Mr. Hage further testified that Mother's visits were moved from supervised at CUA to supervised at DHS due to Mother's erratic behaviors and threats being made to other CUA Case Managers. (N.T. 6/16/2021, p. 91 at 19-25; p. 92 at 1-5 (Exhibit A)).

---

[2] The Adjudicatory Hearing for N.M. was bifurcated from the Goal Change/TPR and Permanency Review Hearings of her siblings to provide ample time for each contested hearing.

On August 17, 2021, the Court began testimony in N.M.'s Adjudicatory Hearing. Counsel for DHS called their first witness, DHS Investigative Worker, Ms. Erica Payne. (N.T. 8/17/2021, p. 12-37 (Exhibit B)). Ms. Payne testified that DHS received a GPS report on January 14, 2021 alleging that Mother had a history of substance abuse and that Mother's conduct placed N.M. at risk. (N.T. 8/17/2021, p. 12 at 17-23 (Exhibit B)). Ms. Payne visited N.M. at St. Christopher's Hospital where she learned that while Mother and N.M. tested negative at birth, Mother tested positive for PCP, cocaine, and heroin during prenatal care. (N.T. 8/17/2021, p. 13 at 2-17; p. 14 at 6-9 (Exhibit B)). When Ms. Payne spoke with Mother, Mother informed her that she was in drug and alcohol treatment at Gaudenzia. (N.T. 8/17/2021, p. 14 at 22-23 (Exhibit B)). While Mother signed consent forms for Gaudenzia and Best Behavioral Health, she refused to sign releases for her prenatal care at TUH. (N.T. 8/17/2021, p. 14 at 24-25; p. 15 at 1; p. 18 at 3-11. (Exhibit B)). Ms. Payne testified that when she visited N.M. in the NICU, N.M. was on oxygen and had respiratory concerns. (N.T. 8/17/2021, p. 16 at 4-8 (Exhibit B)). Mother refused to provide any information regarding N.M.'s father. (N.T. 8/17/2021, p. 18 at 12-23. (Exhibit B)). Ms. Payne further testified that she scheduled a home assessment with Mother, but Mother did not keep the appointment. Due to Mother's refusal, Ms. Payne was unable to assess Mother's housing situation (N.T. 8/17/2021, p. 20 at 15-25; p. 21-22; p. 23 at 1-9; p. 33 at 1-12 (Exhibit B)).

Ms. Payne testified that DHS received reports that on January 24, 2021, Mother was escorted from CHOP by police after attempting to remove N.M. against medical advice. (N.T. 8/17/2021, p. 24 at 13-25; p. 25 at 1-25. (Exhibit B)). Ms. Payne further testified that an OPC was necessary at this point to ensure N.M.'s safety, wellbeing, and that she received the necessary medical treatment. (N.T. 8/17/2021, p. 25 at 1-5; p. 26 at 24-25; p. 27 at 1-3. (Exhibit B)). Ms. Payne testified that she had concerns regarding Mother's mental health, specifically Mother's poor

impulse control, defensiveness, and minimal compliance with the DHS investigation. (N.T. 8/17/2021, p. 27 at 9-20. (Exhibit B)). Ms. Payne also testified that she had concerns regarding Mother's drug and alcohol history. Although Mother was engaged in drug and alcohol treatment at Gaudenzia, and provided screens, she could not confirm whether they were random. (N.T. 8/17/2021, p. 28 at 11-24. (Exhibit B)).

This Court then allowed Mother to call her first witness, Dr. Michelle Duncan, out of order. (N.T. 8/17/2021, p. 46-85 (Exhibit B)). Mother's Counsel sought have Dr. Duncan qualified as an expert witness in parents who are drug-addicted giving birth. (N.T. 8/17/2021, p. 46 at 23-25; p. 47 at 1-3 (Exhibit B)). Dr. Duncan testified that she is currently employed as an OB/GYN at TUH. She testified that she has experience with high-risk pregnancies and has worked with many mothers who had ongoing substance abuse issues during pregnancy. (N.T. 8/17/2021, p. 48-52 (Exhibit B)). On cross-examination, Dr. Duncan testified that she has never published any studies regarding mothers with drug and alcohol issues giving birth, nor has she ever been qualified as an expert in a court of law. (N.T. 8/17/2021, p. 53 at 13-25; p. 54 at 1-4 (Exhibit B)). This Court did not qualify Dr. Duncan as an expert in parents who are drug-addicted giving birth, but allowed Dr. Duncan to continue testifying as a fact witness. (N.T. 8/17/2021, p. 61 at 4-9 (Exhibit B)). Dr. Duncan then testified that Mother tested negative for substances in an October 2020 drug screen and at N.M's birth. (N.T. 8/17/2021, p. 62 at 25; p. 63 at 1-14; p. 84 at 3-13 (Exhibit B)) (See M-2). Dr. Duncan further testified that Mother did not test positive for any substances throughout the time she was treating Mother in 2020. (N.T. 8/17/2021, p. 85 at 10-12 (Exhibit B)).

Counsel for DHS called their next witness, CUA Case Manager/Supervisor, Mr. Joshua Hage. (N.T. 8/17/2021, p. 86-144 (Exhibit B)). Mr. Hage testified that he was previously the assigned Case Manager on this case from November 2019 to November 2020, and was reassigned this case

in May 2021. (N.T. 8/17/2021, p. 87 at 7-11 (Exhibit B)). Mr. Hage stated that he had concerns regarding Mother's mental health due to her inconsistent treatment at Best Behavioral Health and concerns that Mother's medication may not be effective. (N.T. 8/17/2021, p. 88 at 7-17 (Exhibit B)). Mr. Hage testified that he obtained Mother's records from Best Behavioral Healthcare, and that Mother felt she was misdiagnosed with schizoaffective disorder because she had been "under the influence" at the time of the evaluation. (N.T. 8/17/2021, p. 93 at 6-25 (Exhibit B)) (See DHS-9). Mr. Hage also testified that Mother underwent a psychological evaluation on March 13, 2020, in which Mother was diagnosed with opioid dependence, cocaine use disorder, chronic PTSD, major generalized anxiety disorder, and recurrent and severe major depressive disorder. (N.T. 8/17/2021, p. 99 at 1-25; p. 100 at 1-9 (Exhibit B)) (See DHS-10). Following the evaluation, it was recommended that Mother receive PTSD treatment with a trauma specialist, medication to treat her mental health symptoms, and to continue IOP treatment and random drug screens. (N.T. 8/17/2021, p. 100 at 9-18 (Exhibit B)). Mr. Hage further testified that he felt a mother-baby program was not appropriate due to concerns about Mother's protective capacity given her inconsistent mental health treatment and Mother having unsupervised contact with N.M. (N.T. 8/17/2021, p. 113 at 10-21; p. 114 at 8-17; p. 115 at 3-5 (Exhibit B)).

Mr. Hage testified that Mother did not currently have suitable housing for N.M. (N.T. 8/17/2021, p. 101 at 3-8 (Exhibit B)). At the time, Mother resided with maternal grandmother. (N.T. 8/17/2021, p. 101 at 22-25 (Exhibit B)). On July 14, 2021, he attempted to assess Mother's home, but maternal grandmother stated that her home could not be considered a reunification resource. (N.T. 8/17/2021, p. 101 at 9-21 (Exhibit B)). Additionally, Mr. Hage testified that his main concerns regarding Mother's drug history were because Mother had been inconsistent with her sobriety. (N.T. 8/17/2021, p. 104 at 1-5 (Exhibit B)). Mr. Hage also testified

that Mother produced negative drug screens from Gaudenzia, but he could not confirm that any of the screens were random. (N.T. 8/17/201, p. 103 at 12-21 (Exhibit B)). Regarding visitation, Mr. Hage testified that Mother's visits with N.M. were moved from supervised at the agency twice per week to supervised at DHS due to Mother's behavioral outbursts and concerns for the safety of CUA staff. (N.T. 8/17/2021, p. 14 at 6-18 (Exhibit B)).

Mother then called her next witness, Director of Gaudenzia WINNER program, Ms. Krystal Marie Caraballo. Counsel for Mother called Ms. Caraballo to testify about the Gaudenzia WINNER program, a mother-baby program that accepted Mother, which would address substance abuse and mental health concerns. (N.T. 8/17/2021, p. 152-169 (Exhibit B)).

On November 19, 2021, the court concluded testimony in N.M.'s Adjudicatory Hearing. After the last court date, August 17, 2021, Ms. Ericka Mitchell became the CUA Case Manager. (N.T. 11/19/2021, p. 17 at 9-13 (Exhibit C)). Ms. Mitchell stated that she was assigned to this case on September 13, 2021. (N.T. 11/19/2021, p. 18 at 12-19 (Exhibit C)). Ms. Mitchell testified that her main concern was Mother's mental health, specifically concerns regarding her aggressive and erratic behaviors. (N.T. 11/19/2021, p. 18 at 25; p. 19 at 1-5 (Exhibit C)). Ms. Mitchell further testified that Mother displayed aggressive behaviors throughout the life of the case. This included threating CUA staff members and foster parents of N.M.'s sibling. (N.T. 11/19/2021, p. 19 at 15-25; p. 20 at 1-2 (Exhibit C)). Ms. Mitchell testified that there was an incident in April 2021 in which Mother threatened a case aide who was supervising a visit. (N.T. 11/19/2021, p. 20 at 12-25; p. 21 at 1-25; p. 22 at 1-19 (Exhibit C)) (See DHS-12). Ms. Mitchell also testified about a recent incident on November 17, 2021, where Mother allegedly threatened the resource parent for N.M.'s sibling and stated that she "would blow the foster parent's head off." (N.T. 11/19/2021, p. 21 at 20-25; p. 22 at 1-25; p. 24 at 1-3 (Exhibit C)). Ms. Mitchell further testified that she had

been unable to obtain Mother's mental health records due to Mother's refusal to sign mental health releases. (N.T. 11/19/2021, p. 24 at 20-25; p. 25 at 1-25; p. 26 at 1-3 (Exhibit C)).

On cross-examination by the Child Advocate, Ms. Mitchell testified that Mother lived with maternal grandmother. Ms. Mitchell testified that because she was unable to perform a home assessment, she was unsure if the home was appropriate for N.M. (N.T. 11/19/2021, p. 31 at 9-13 (Exhibit C)). Ms. Mitchell stated that she still had concerns for Mother's mental health and anger management despite Mother completing an anger management program. (N.T. 11/19/2021, p. 32 at 7-9; p. 33 at 6-19 (Exhibit C)). Ms. Mitchell testified that Mother obtained random drug screens through her treatment program at Gaudenzia. Ms. Mitchell testified that Mother's most recent screen from November 5, 2021 was negative. (N.T. 11/19/2021, p. 32 at 10-24 (Exhibit C)). Ms. Mitchell also testified that Mother completed a parenting course, and that she did not have concerns regarding Mother's parenting at this time. (N.T. 11/19/2021, p. 34 at 9-14 (Exhibit C)).

On cross-examination by Mother's Counsel, Ms. Mitchell testified Mother was approved for housing in Westmoreland County, but that the home was conditioned on Mother being reunified with all seven children. (N.T. 11/19/2021, p. 47 at 20-23; p. 21-24 (Exhibit C)). On redirect examination, Ms. Mitchell testified that the Westmoreland County home was not a viable housing option anymore given Mother's ongoing Goal Change Termination hearing for N.M.'s two siblings. (N.T. 11/19/2021, p. 95 at 25; p. 96 at 1-24 (Exhibit C)). Additionally, Mother submitted various certificates of completion including Gaudenzia Outreach, anger management, and parenting education. (N.T. 11/19/2021, p. 55-58 (Exhibit C)) (See M-8, M-9, M-10).[3] Mother also submitted various negative drug screens from 2020 and 2021. While Ms. Mitchell was able to

---

[3] All Counsel stipulated as to Mother's completion of parenting education, anger management, and Gaudenzia Outreach. (N.T. 11/19/2021, p. 60 at 1-8 (Exhibit C)). Counsel for DHS did not stipulate to any drug screens submitted by Mother's counsel. (Id. at 9-14).

8

confirm that Mother's drug screens from Gaudenzia and Quest Diagnostics were random, she could not confirm whether any other screens submitted by Mother were random. (N.T. 11/19/2021, p. 32 at 17-21; p. 88 at 23-25; p. 89 at 1 (Exhibit C)). (See M-4, M-11, M-12, M-14).

On redirect examination, Ms. Mitchell testified that Mother's mental health as well as her aggressive and erratic behaviors may affect her ability to parent N.M. and could jeopardize N.M.'s safety. (N.T. 11/19/2021, p. 89 at 24-25; p. 90 at 1-3; p. 91 at 1-16; p. 97 at 25; p. 98 at 1-6 (Exhibit C)). Regarding Mother's mental health treatment at The Wedge Recovery Centers ("The Wedge"), Ms. Mitchell testified that Mother completed intake on August 19, 2021. She attended five out of seven individual therapy sessions since the intake. (N.T. 11/19/2021, p. 92 at 3-21 (Exhibit C)).

Following the testimony of Ms. Mitchell, Mother took the witness stand. (N.T. 11/19/2021, p. 108-168 (Exhibit C)). Mother denied using or testing positive for any substances during her pregnancy with N.M. (N.T. 11/19/2021, p. 110 at 8-10 (Exhibit C)). Mother also testified that she is not currently using any substances and has been clean for two years. (N.T. 11/19/2021, p. 113 at 2 (Exhibit C)). Mother denied the November 17, 2021 incident, in which she allegedly threatened N.M.'s sibling's foster parent. (N.T. 11/19/2021, p. 34 at 19-23 (Exhibit C)). Additionally, Mother testified that she is compliant with her mental health treatment and finds it helpful. (N.T. 11/19/2021, p. 117 at 20-25; p. 1-3 (Exhibit C)).

Mother's Counsel called her final witness, kinship parent for N.M., Ms. Bridget Powell. (N.T. 11/19/2021, p. 171-185 (Exhibit C)). Ms. Powell testified that she is to allow Mother and N.M. to reside with her on a safety plan. (N.T. 11/19/2021, p. 172 at 13-25 (Exhibit C)). She also testified that she does not have concerns about Mother's substance use, citing that Mother has made great progress since the time she had been using. (N.T. 11/19/2021, p. 173 at 11-24 (Exhibit C)). Ms. Powell also testified that she understands how N.M. came into care, but does not

9

believe Mother had any substance use issues at the time N.M. was placed. (N.T. 11/19/2021, p. 178 at 20-22; p. 179 at 3-8 (Exhibit C)). Ms. Powell stated that while she acknowledges that Mother has mental health concerns, she does not feel that Mother's mental health would impact her ability to care for N.M. (N.T. 11/19/2021, p. 179 at 9-18 (Exhibit C)).

Counsel made arguments on November 19, 2021, and the record was kept open for two weeks to allow Counsel for DHS and Mother's Counsel to submit amended exhibits.[4] (N.T. 11/19/2021, p. 186 at 6-12 (Exhibit C)). The Court continued the Adjudicatory Hearing until January 13, 2022, and stated that it would give its ruling at that time. However, because this adjudication had been deferred for several months and in the interest of judicial economy, this Court ruled earlier. Upon receiving the amended exhibits, this Court issued an Order adjudicating N.M. dependent based on present inability and committing the Child to DHS on December 7, 2021. (See Trial Court Order 12/7/21). Mother timely filed this Notice of Appeal and a Concise Statement of Errors Complained of on Appeal on January 5, 2021.[5]

## III. STATEMENT OF MATTERS COMPLAINED ON APPEAL

In the Pa. R.A.P. 1925(b) Statement of Matters Complained of on Appeal, the Appellant identifies the following issue(s):

1. The Trial Court erred in ruling that N.M. be adjudicated dependent without holding an adjudicatory hearing.

2. The Trial Court erred in ruling that N.M. be committed to DHS, without holding a dispositional hearing.

---

[4] The record was kept open because some exhibits were illegible, pending authentication, or needed to be submitted in color.

[5] Regarding N.M.'s adjudication of dependency, Mother's Counsel filed this Notice of Appeal on behalf of her client. Mother also filed her own Notice of Appeal *pro se* despite being represented by counsel. Mother's Counsel was informed that she would be required to withdraw one of the Notices of Appeal. However, when this Court filed its Opinion, Mother had not yet done so. Mother's filing of a *pro se* Notice of Appeal while being represented by counsel was in contravention of the appellate rules. See *Commonwealth v. Jette*, 23 A.3d 1032 (Pa. 2011). Therefore, this Court only addressed the issues raised in the Notice of Appeal filed by Mother's Counsel. This Court respectfully requests that Mother's *pro se* appeal be quashed.

10

3. The Trial Court erred in ruling as stated above, without making findings, determinations, and orders required by the Juvenile Act and by court rules, including but not limited to, Pa. R.J.C.P. 1401.

4. The Trial Court erred in failing to rule upon Appellant's Motion for Reconsideration, thus forcing Appellant to choose between 1) losing her rights to obtain relief, and 2) filing this Appeal, and divesting the Trial Court of jurisdiction to take further action.

5. The Trial Court erred in denying Due Process of Law to Appellant J.M., Mother, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America.

6. Appellant J.M., Mother, reserves the right to expand and to supplement this Concise Statement, and to raise additional issues in her Appellant's Brief for the following reasons:
    a. Pursuant to Children's Fast Track Rules, this Concise Statement is being filed at the same time as is the Notice of Appeal and Order for Transcript.
    b. Therefore, this Concise Statement must be prepared and filed without benefit of a copy of the Transcript.

For the purposes of this opinion, Mother's issues 1 through 6 will be consolidated to read: Did the trial court err when it found N.M. dependent based on DHS meeting their burden of proof. Did the trial court err or abuse its discretion by removing N.M. from Mother's care and placing her in kinship care? Did the trial court deny Mother of her right to due process of law?

## IV.  STANDARD OF REVIEW

The proper standard of review when considering a trial court's determination of a petition to terminate parental rights is abuse of discretion. This standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9 A.3d 1179, 1190 (2010). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*. 934 A.2d 107, 111 (Pa. Super. 2007).

11

Our standard of review of dispositional orders in juvenile proceedings is settled. The Juvenile Act grants broad discretion to juvenile courts in determining appropriate dispositions. *In re C.A.G.*, 89 A.3d 704, 709 (Pa. Super.2014). Indeed, the Superior Court will not disturb the lower court's disposition absent a manifest abuse of discretion. *In the Interest of J.D.*, 798 A.2d 210, 213 (Pa. Super. 2002). Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion. See *Commonwealth v. Widmer*, 689 A.2d 211 (Pa. 1997), and *Commonwealth v. Brown*, 648 A.2d 1177, 1189-1192 (Pa. 1994).

## V.   DISCUSSION

### A. The Trial Court Properly Adjudicated N.M. Dependent Pursuant to 42 Pa.C.S.A. §6302(1)[6] and 42 Pa.C.S.A. §6341 (a), (c), and (d)[7] of the Juvenile Act.

Mother alleges in her Concise Statement of Matters Complained of on Appeal, that this Court erred when it found that there was clear and convincing evidence to adjudicate N.M. dependent. This Court disagrees.

---

[6] **42 Pa.C.S.A. § 6302-Definitions-**The following words and phrases when used in this chapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section: **"Dependent child."** A child who: (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk.

[7] **42 Pa.C.S.A. § 6341. Adjudication - (a) General rule.** -- After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child. If the petition alleges that the child is delinquent, within seven days of hearing the evidence on the petition, the court shall make and file its findings whether the acts ascribed to the child were committed by him. This time limitation may only be extended pursuant to the agreement of the child and the attorney for the Commonwealth. The court's failure to comply with the time limitations stated in this section shall not be grounds for discharging the child or dismissing the proceeding. If the court finds that the child is not a dependent child or that the allegations of delinquency have not been established it shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding.

**(c) Finding of dependency.**--If the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

**(d) Evidence on issue of disposition.**--(1)(i) In disposition hearings under subsections (b) and (c) all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. (ii) Subparagraph (i) includes any screening and assessment examinations ordered by the court to aid in disposition, even though no statements or admissions made during the course thereof may be admitted into evidence against the child on the issue of whether the child committed a delinquent act. (2) The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making the reports. Sources of information given in confidence need not be disclosed.

12

The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets the statutory definition of dependency. *In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004). Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)). Under 42 Pa.C.S.A. § 6302(1) a dependent child is defined as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk; 42 Pa.C.S.A. § 6302.

A dependency trial is a two-part process. The first part requires the trial court to hear evidence and to determine, by clear and convincing evidence, that the child is without proper parental care, control, or subsistence necessary for the child's physical, mental, moral, or emotional health. *In re A.B.*, 63 A.3d 345, 349 (Pa Super. 2013). If the trial court finds the child dependent, the trial court may then move to the second part, in which it must make an appropriate disposition based upon an inquiry into the best interest of the child. *In re LC.*, II, 900 A.2d 378, 381 (Pa. Super. 2006). See *In re A.E.*, 722 A.2d 213, 215 (Pa. Super. 1998).

Pennsylvania law makes it clear that a finding of dependency can be made based on prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent. *In re R.W.J.*, 2003 PA Super 208, ¶ 11, 826 A.2d 10, 14 (Pa. Super. Ct. 2003) (citing *In Interest of Black*, 273 Pa. Super. 536, 417 A.2d 1178 (1980)). Pennsylvania Superior

13

Court found that when determining whether a parent is providing a minor with proper care and control, they believe that the caretaker's acts and omissions should weigh equally. *In Interest of JOV*, 686 A.2d 421, 423 (1996). The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict. Id.

The testimony offered at the Adjudicatory Hearing clearly supports this Court's order. This Court heard clear and convincing evidence from DHS Investigator, Ms. Erica Payne, and CUA Case Managers, Mr. Joshua Hage and Ms. Ericka Mitchell, that N.M.'s health and safety were at risk due to Mother's present inability to provide adequate care for N.M. During the Adjudicatory Hearing on August 17, 2021, Ms. Payne testified that she had concerns regarding Mother's history of substance abuse as well as mental health. Ms. Payne testified that while Mother and N.M. tested negative at birth, Mother tested positive for PCP, cocaine, and fentanyl during her pregnancy with N.M. Specifically, Ms. Payne testified that she had concerns regarding Mother's poor impulse control, defensiveness, and minimal compliance with the DHS investigation. Additionally, Ms. Payne testified that although Mother provided drug screens from her treatment program at Gaudenzia, neither she could not confirm whether they were random. Ms. Payne stated that removing the Child from Mother's care was necessary to ensure N.M.'s safety, wellbeing, and that she received the necessary medical treatment.

Ms. Payne's testimony was corroborated by CUA Case Managers, Mr. Hage and Ms. Mitchell. On August 17, 2021, Mr. Hage testified that he had concerns regarding Mother's mental health, inconsistency with sobriety, and housing. At the August 17, 2021 hearing, Mr. Hage testified that Mother did not have appropriate housing. Ms. Mitchell also testified on November 19, 2021, that she had been unable to assess Mother's home, and could not determine whether Mother had

14

appropriate housing for N.M. Additionally, Mr. Hage had concerns with Mother having unsupervised contact with N.M. due to Mother's visits with N.M. being supervised at DHS with increased security because of Mother's outbursts and threats to CUA staff. Ms. Mitchell still had concerns regarding Mother's aggressive and erratic behaviors on November 19, 2021. Specifically, Ms. Mitchell testified about an incident occurring on November 17, 2021, in which Mother allegedly threatened "to blow the head off" the foster parent of N.M.'s sibling. Ms. Mitchell further testified that she believed Mother's mental health and aggressive behavior could affect her ability to parent N.M. and could jeopardize N.M.'s safety.

This Court commends Mother for making progress to alleviate the dependency issues which brought N.M. into care. However, this Court still has concerns with Mother's ability to provide adequate care for N.M. The record reflects the following issues that led to an adjudication of dependency and commitment to DHS. While CUA Case Manager, Ms. Mitchell, confirmed that Mother's drug screens from Gaudenzia and Quest Diagnostics were random, she could not confirm whether any other screens submitted by Mother were random. (See M-4, M-11, M-12, M-14). Additionally, because CUA has been unable to assess Mother's current housing, it is unclear whether Mother has appropriate housing for N.M. Mother's mental health stability and anger management remain barriers to reunification at this time. Mother has previously refused to sign mental health releases, thus this Court is not aware if Mother's current mental health provider, The Wedge, has a full picture of Mother's mental health history and diagnoses. This Court heard testimony about Mother's aggressive and erratic behaviors despite completing an anger management program. There were credible allegations that Mother threatened physical violence against the foster parent of N.M.'s sibling as recently as November 17, 2021. Additionally, Mother's visits with N.M. are supervised with increased security due to Mother's threatening

15

behavior. This Court finds that Mother's mental health impacts her ability to provide adequate parental care to N.M., and could place N.M.'s safety and wellbeing at risk.

It is well-settled that "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.*, 826 A.2d 10, 14 (Pa.Super.2003). The facts and circumstances which led to N.M.'s siblings coming into care, Mother's lack of compliance with her Single Case Plan (SCP) objectives, as well as her progress towards reunification in those cases is relevant and admissible for N.M.'s case. Mother currently has six other children in DHS care. When N.M. came into care, Mother's compliance with her SCP objectives in those cases was minimal. This Court was able to consider evidence relating to N.M. as well as N.M.'s siblings in its decision to adjudicate N.M. dependent.

Mother's Counsel alleges that this Court adjudicated N.M. dependent and committed her to DHS without holding adjudicatory and dispositional hearings. The record is clear that adjudicatory hearings for this case occurred on June 16, 2021, August 17, 2021, and November 19, 2021. This Court heard extensive testimony on those dates. Mother's position that this Court adjudicated N.M. dependent without holding adjudicatory or dispositional hearings is without merit.

After hearing the evidence presented, this Court found that DHS met its burden by clear and convincing evidence that N.M. was a dependent child pursuant to 42 Pa.C.S.A. § 6302(1) and was without proper parental care. Such proper parental care was not immediately available due to Mother's ongoing mental health, anger management, and housing issues. The testimony heard was clear and convincing that N.M.'s health and safety were at risk, and N.M. was adjudicated dependent.

**B. The Trial Court did not Abuse its Discretion in Finding that DHS met its Burden to Remove N.M. from Mother's Care and Placing Her in Kinship Care.**

Mother alleges the Court erred in ordering the continued removal of N.M. from Mother's care and committing N.M. to DHS. This Court disagrees.

Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined by the child's best interests. *In re Sweeney*, 574 A.2d 690, 691 (Pa. Super. 1990). The trial court may remove a child from the care of the child's parents only upon showing of clear necessity. *In re E.P.*, 841 A.2d 128, 132 (Pa. Super. 2003). Before the trial court can enter any order of disposition that would remove a dependent child from their home, the court must determine that prior to placement, reasonable efforts were made to prevent or eliminate the need for removal of child from the home. 42 Pa.C.S.A §6351(b)(2). The burden of proof in a dependency proceeding is on the petitioner. *In re C R.S.*, supra at 842-843.

The purpose of the Juvenile Act is to preserve the unity of the family whenever possible. 42 Pa.C.S.A. §6301(b)(1). Nonetheless, a child will be adjudicated dependent when the child is presently without proper parental care and the care is not immediately available. *In re R.T.*, 592 A.2d 55, 57 (Pa. Super. 1991) (citing *In Re LaRue*, 366 A.2d 1271 (Pa. Super. 1976)). Superior Court has defined proper parental care as the care which is geared to the particularized needs of the child and, at a minimum, is likely to prevent serious injury to the child. *In re C. R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997) (citing *In Interest of Justin S.*, 543 A.2d 1192, 1200 (Pa. Super. 1988)).

The court heard credible testimony from DHS Investigator, Ms. Payne, as well as CUA Case Managers, Mr. Hage and Ms. Mitchell, that there are outstanding dependency issues which affect Mother's ability to provide adequate care for N.M. This Court recognizes that Mother has made some progress and hopes she continues to make progress towards reunification. However, this Court is greatly concerned about Mother's mental health, anger management, and ability to safely

17

care for N.M. at this time. This Court does not believe Mother's present mental health is stable enough for her to reunify with N.M. Additionally, this Court heard credible allegations that on November 17, 2021, Mother threatened to physically harm the foster parent of N.M.'s sibling. Because Mother did not sign mental health releases until November 19, 2021, this Court is unaware if Mother's current mental health treatment at The Wedge is addressing all her mental health issues. Additionally, because CUA has been unable to assess Mother's current housing, it is unknown whether Mother's has appropriate housing for N.M. This Court is also concerned about Mother's history of substance use given her inconsistency with sobriety, and because Mother tested positive for substances during her pregnancy with N.M. Therefore, this Court found that Mother lacked the ability to immediately provide adequate care for N.M. should she be returned to her. This Court determined that a return to Mother at this point would create a health and safety risk for N.M., and it would be in the best interests of the Child for her to remain in kinship care.

Based on the credible evidence presented during the Adjudicatory hearings, this Court found that N.M. should remain placed in kinship care and committed to DHS. This Court found clear and convincing evidence to support the finding that the reasons and conditions which necessitated the placement of N.M. had not been alleviated and that it would be contrary to N.M.'s welfare and best interest to reunify her with Mother at that time.

## C. The Trial Court Did Not Violate Mother's Right to Due Process of Law.

Mother alleged in her Concise Statement of Matters Complained of on Appeal that this Court violated her right to Due Process of Law as guaranteed by the Constitution of the Commonwealth of Pennsylvania. This Court disagrees.

Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). Due process is flexible and calls for such procedural

18

protections as the situation demands. *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

This broad assertion does not state the basis of the denial of Mother's due process rights, and this Court cannot speculate what Mother's counsel intended this assertion to mean. Mother was appointed counsel to represent her at each listing. At each listing, and specifically at the Adjudicatory Hearings on June 16, 2021, August 17, 2021, and November 19, 2021, Mother had the opportunity to participate and testify, as well as present evidence and witnesses on her own behalf. Mother participated at the hearings and testified. Mother's Counsel cross-examined witnesses and presented evidence. Due process requires notice, an opportunity to be heard, and the opportunity to defend oneself in an impartial tribunal; Mother's due process rights were not violated. Mother's assertion that this Court violated her right to Due Process of law is meritless.

## VI.    CONCLUSION

For these reasons, this Court respectfully requests that the Order dated December 7, 2021,

Adjudicating N.M. Dependent and committing her to DHS, be AFFIRMED.

BY THE COURT:

Date: _____ January 26, 2022

Cateria R. McCabe, Judge

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing ORDER has been filed and served upon the following parties, as set forth below:

**PACFILE**

**Guardian Ad Litem:**
Tracey Chambers Coleman, Esquire
6150 N Broad St., #49105
Philadelphia, Pennsylvania 19141

**Counsel for Mother:**
Linda G. Walters, Esquire
PO Box 168
Flourtown, PA 19031

**Counsel for Department of Human Services:**
Luisa Garcia, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

January 26, 2022
Date

Cateria R. McCabe, Judge

21